IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| DORIS M. HARRIS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:14-CV-3663-D |
| VS. | § | |
| | § | |
| DALLAS COUNTY HOSPITAL | § | |
| DISTRICT d/b/a PARKLAND HEALTH | § | |
| & HOSPITAL a/k/a PARKLAND | § | |
| HOSPITAL, jointly and severally, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

In this action alleging claims under the Americans with Disabilities Act of 1990

("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Texas Commission on Human Rights Act

("TCHRA"), Tex. Labor Code Ann. § 21.001 *et seq.* (West 2016), defendant Dallas County

Hospital District d/b/a Parkland Health & Hospital System ("Parkland") moves for summary

judgment. For the following reasons, the court grants the motion and dismisses this action

by judgment filed today.

I

Plaintiff Doris M. Harris ("Harris") worked as a Patient Financial Services

Registration Specialist ("PRS") in the Patient Financial Services Department ("Department")

at Parkland from 2001 until her termination in 2014.[1]

_____

[1]In deciding this motion, the court views the evidence in the light most favorable to
plaintiff as the summary judgment nonmovant and draws all reasonable inferences in her

At Parkland, the primary duties of a PRS include verifying patient demographics and financial information, obtaining required patient signatures, and securing patients' valuables. PRSs perform these duties by gathering information from patients at their bedsides or by gathering the information at a designated PRS workstation, discharge booth, or cashier booth, depending on the unit. There are several areas of the hospital in which PRSs perform their registration duties: the Labor and Delivery Triage Unit ("L&D Triage"); the Psychiatric Emergency Department; the OB/GYN Intermediate Care Center ("OB/ICC"); and the Main Emergency Department ("Main ED"), which consists of the arrival desk, waiting room, six patient "pods," and a cashier booth.

From 2001 until 2005, Harris worked part-time (12-hour shifts on Saturday and Sunday) as a PRS in all areas of the Main ED. In 2005, however, after she had knee surgery to repair a torn meniscus, and at the recommendation of her surgeon, Harris requested to be transferred to an area of the emergency room that required less walking, to take the pressure off of her knee. Parkland granted Harris's request and transferred her to L&D Triage, which at the time had very little patient traffic and limited walking requirements. Harris worked in L&D Triage from 2005 until 2009. In 2009, Harris accepted a full-time PRS position in OB/ICC, and from 2009 until approximately July 2013, Harris worked primarily in OB/ICC, providing coverage in L&D Triage as necessary. During this time, Tamar Scott ("Scott"),

favor. *See, e.g., Owens v. Mercedes-Benz USA, LLC*, 541 F.Supp.2d 869, 870 n.1 (N.D. Tex. 2008) (Fitzwater, C.J.) (citing *U.S. Bank Nat'l Ass'n v. Safeguard Ins. Co.*, 422 F.Supp.2d 698, 701 n.2 (N.D. Tex. 2006) (Fitzwater, J.)).

Harris' immediate supervisor, began discussing with Harris the possibility of rotating her out

of OB/ICC.  In February 2012 Harris presented a Work/School Release and Appointment

Verification form ("February 2012 Medical Release") signed by her primary physician, Jean

A. Akpan, M.D. ("Dr. Akpan"), in which Dr. Akpan provided the following medical

release/restrictions:

> [Harris] is able to walk a maximum of 4 hours out of 8 hours
> because of prior knee surgeries.  Because of this restriction [she]
> will not be able to perform registration duties in the main
> emergency room.

P. App. 17.  After receiving this documentation, Scott no longer discussed with Harris the

possibility of rotating out of OB/ICC.

In 2012 Parkland reorganized the Department, resulting in a reduction-in-force

("RIF").  As part of the reorganization, the Department also acquired an additional unit to

support (the Urgent Care Center).  Due to the reduced number of staff following the RIF, and

the acquisition of an additional unit, Parkland decided that its PRSs would now function as

"floaters" throughout the units they supported, in order to ensure adequate coverage and to

ensure that registration of patients was performed in a timely and efficient manner.[2]  In April

2013 the job description outlining the essential functions of the PRS position was revised to

include the new duties of floating on a rotation schedule throughout the hospital.

In April 2013 Stacey Williams-Brim ("Williams-Brim") replaced Scott as Harris'

---

[2]Before the reorganization, PRSs worked in assigned areas and were not expected to
float throughout the hospital.

immediate supervisor.  The following month, the Associate Director of Registration, Tamika Cook ("Cook"), to whom Williams-Brim reported, charged Williams-Brim with implementing the new rotation schedule.  Pursuant to this directive, Williams-Brim informed Harris in July 2013 that she would no longer remain working only in the OB/ICC but would instead be required to float throughout the hospital.  Harris informed Williams-Brim that, due to her 2005 knee surgery, she would not be able to rotate to the Main ED.  Williams-Brim requested documentation of Harris' present limitations due to her past knee surgery, but temporarily permitted Harris to remain working in the OB/ICC while she cross-trained other PRSs for floating through the OB/ICC, or at the arrival desk, waiting room, or discharge booth where she could sit while performing her registration and discharge duties.  According to Parkland, while Harris remained working in the OB/ICC, other PRSs complained to Williams-Brim that Harris was "cadillacing," or shirking her work duties by avoiding work in the more demanding Main ED, and that it was unfair that they had to work longer and harder under the new schedule while Harris, who was not floating, worked only in the low patient volume, slow-paced areas.

In July 2013 Harris provided documentation ("July 2013 Medical Release") from Dr. Akpan regarding her request for accommodation.  As in the February 2012 Medical Release, Dr. Akpan opined that Harris "is able to walk a maximum of 4 hours out of 8 hours because of prior knee surgeries.  Because of this restriction [she] will not be able to perform registration duties in the main emergency room."  D. App. 33.

On July 30, 2013 Harris and Williams-Brim met to discuss the July 2013 Medical

Release.  During this meeting, Williams-Brim informed Harris that because Parkland's PRS job description only required a maximum of two hours of walking per shift, and Dr. Akpan's July 2013 Medical Release stated that Harris could walk up to four hours in an eight-hour shift, Harris would be required to work in the Main ED.  Three days later, Harris met with Williams-Brim, Cook, Manager Keitwanna Cotton ("Cotton"), and Senior Human Resources Generalist Stephen Graham ("Graham") to discuss Harris' request not to float and to remain working only in the OB/ICC.[3]  During this meeting, Graham and Williams-Brim again explained to Harris that her job only required two hours of walking per day, and Harris again responded that she could not work in the Main ED because this would require her to walk much more than her four-hours-per-shift limitation, and caused her knee pain.  Graham then provided Harris a copy of her job description and a Request for Medical Evaluation Safety Concerns form ("Safety Concerns Form") to be completed by Harris' doctor.

According to Parkland, after the meeting, Graham personally investigated whether PRSs were actually walking more than four hours per shift in the Main ED and determined, based on his observations and input from other PRSs, that PRSs were not walking more than the four-hours-per-shift limitation prescribed by Harris' physician.[4]  Cotton then sent an

_____

[3]Harris has filed a motion for leave to file supplement to plaintiff's summary judgment evidence, seeking to add nine pages of a transcript of a conversation that she maintains is relevant to the ultimate issue of whether working in the Main ED required more than two hours of walking per shift.  Because consideration of this evidence does not change the outcome of this case, the court grants Harris' motion.

[4]Harris disputes this conclusion.  She contends that, contrary to Parkland's description, more than two hours of walking is required of PRSs working in the Main ED.

August 4, 2013 email to management staff (including Williams-Brim and Cook) that stated:

> [i]n order to promote consistency and fairness throughout each shift, effective immediately; please make sure that _all_ Staff rotate through the ED on a consistent basis.  All Staff members should rotate and not work in one specific location for extended periods of time. (ie: weeks, months)[.]  The only exception to this is if there is a medical necessity for the employee to work in specific areas.

P. App. 82.

On August 9, 2013 Dr. Akpan completed the Safety Concerns Form as requested.  On this form, she checked the box that stated, "[b]ased on my examination, I have not found any impairment(s) that may prevent employee from performing essential[] job functions or which pose a threat to the health and safety of the employee or others."  D. App. 35.  Dr. Akpan stated:

─────────────────

She maintains that this is primarily because PRSs must constantly walk between the patient's room (or another location if the patient is not in the room), the workstation, and the discharge booth. According to Harris,

> [b]ecause of the number of patients, the number of hallways, the number of PODs, the number of rooms, a [PRS] in the Main ED walks constantly 6-7 hours per shift.  The only time a [PRS] gets to sit down for any significant period of time is on his 30 minute lunch break, short periods of time entering data . . ., and with 30 minutes left in his shift (typically the time a [PRS] enters the patient information he was unable to enter earlier in the shift).

P. Br. 10-11.  In OB/ICC, the registration process typically occurs at the PRS's window, and a PRS is only required to get up to find a patient if that patient has been placed in a room because of an emergency situation.  In L&D Triage, although there is bedside registration, patients are only 10-15 steps away from the PRS desk, and there are only 11 beds on the floor.

> [Harris] [i]s able to walk a maximum of 4 hours out of 8 hours. Job description requires that she be able to walk 2 hours a day, which she is able to meet. Doris Harris states that the actual need for walking in emergency room registration is closer to 7 hours a day. Therefore, I do not recommend that she perform registration duties in the main emergency room.

*Id.* Because Graham had already determined that PRSs were not walking more than four hours per shift, and because Dr. Akpan opined that Harris could in fact perform the "essential functions" of her job of walking up to two hours per shift, Parkland's Human Resources Department concluded that Harris did not require an accommodation to perform the "essential functions" of her PRS position. D. Br. 8.

In September 2013 Harris provided Parkland another note from Dr. Akpan ("September 2013 Medical Release"). In the September 2013 Medical Release Dr. Akpan requested that Harris be accommodated.

> I have reviewed her essential job functions. Based on my examination the employee has an impairment that prevents the performance of essential job functions while working in the main emergency room because the actual job duties require up to 7 hours a day of walking. Please accommodate her impairment by allowing her to work in areas that do not require walking more than two hours out of eight (which is what the job description states) such as [OB/ICC], labor and delivery, labor and delivery triage, and discharge booth for the emergency room.

D. App. 34. Despite this request for accommodation, Parkland determined that Harris did not need an accommodation because it had already confirmed that PRSs were not walking seven hours per shift while performing their job duties. Accordingly, Parkland did not accommodate Harris' request, and it required that she rotate through the Main ED. Harris

did not make any further requests for accommodation.

According to Parkland, in 2013 Harris made several errors in the performance of her job duties and received progressive discipline pursuant to Parkland's Corrective Action Policy.  On August 19, 2013 Harris received a verbal warning for working unapproved overtime, in violation of Parkland's Time and Labor Policy and Overtime Utilization Policy. On August 28, 2013 Harris received a written warning when she failed to notice that a patient's name was misspelled on the patient label, even though she had previously been trained on the importance of ensuring accurate patient records.  And on October 16, 2013 Harris received a final warning when she failed to notice that a patient's signature on the Consent to Medical Treatment form did not match the patient's label.  In connection with this final warning, Harris was advised that a further infraction could result in termination.

On May 29, 2014 Harris' coworker, Trashonda Gosha ("Gosha") complained to Williams-Brim that Harris had confronted her in the patient-service area of the Main ED and demanded that Gosha talk to her.  Gosha allegedly reported that she told Harris she did not want to talk to her and tried to get away from Harris, but Harris "got in Gosha's face," repeatedly pulled and held onto Gosha's arm preventing her from walking away, followed Gosha outside of the hospital, and kept trying to force Gosha to talk to her. D. Br. 11.  Harris finally left Gosha alone when they made it outside of the hospital, and Gosha told Harris to leave her alone.  Williams-Brim reported Gosha's complaint to Cook and Parkland's Police Department, but when Gosha chose not to press charges against Harris, the police investigation determined that the incident was a Human Resources matter.  Williams-Brim,

Cook, and Human Resources Business Partner Rueben Parra reviewed the surveillance video of the incident and determined that, although Harris' conduct may not have been criminal, "her conduct toward another colleague in a patient-service area was nevertheless aggressive, disruptive, and unprofessional in violation of Parkland's Colleague Behavior Expectations Policy."[5]  *Id.* at 12.  Accordingly, because Harris had already been given a final warning, Parra recommended, and Williams-Brim agreed, that Harris' employment should be terminated.  Cook and Vice President of Patient Access, Bob Reed ("Reed") approved the termination, and Harris was terminated on June 4, 2014.

On July 14, 2014 Harris filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging disability discrimination and retaliation.  Harris then sued Parkland in this court alleging claims for disability discrimination, hostile work environment, retaliation, and wrongful termination, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII'), 42 U.S.C. § 2000e *et seq.*, the ADA, and the TCHRA.  The parties have stipulated to the dismissal of Harris' race, color, sex, age, religion, and national origin claims.  Parkland now seeks summary judgment on Harris' remaining claims (i.e., her claims for failure to accommodate, discrimination, harassment, and retaliation under the ADA).  Harris opposes the motion.

---

[5]The Colleague Behavior Expectations Policy provides, in pertinent part, that employees must conduct themselves in a "patient-centered, appropriate, and professional manner, and shall not engage in unacceptable or disruptive behavior." D. App. 48.

II

When a party moves for summary judgment on claims on which the opposing party will bear the burden of proof at trial, the moving party can meet its summary judgment obligation by pointing the court to the absence of admissible evidence to support the nonmovant's claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party does so, the nonmovant must go beyond her pleadings and designate specific facts showing there is a genuine issue for trial. *See id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). An issue is genuine if the evidence is such that a reasonable jury could return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmovant's failure to produce proof as to any essential element of a claim renders all other facts immaterial. *See TruGreen Landcare, L.L.C. v. Scott*, 512 F.Supp.2d 613, 623 (N.D. Tex. 2007) (Fitzwater, J.). Summary judgment is mandatory if the nonmovant fails to meet this burden. *Little*, 37 F.3d at 1076.

III

The court begins with Harris' failure to accommodate claim asserted under the ADA.[6]

---

[6]Parkland initially contends that Harris' failure-to-accommodate claim is time-barred because Harris failed to file her charge of discrimination within 300 days of Parkland's denial of her request for an accommodation. Because the court is granting Parkland's motion for summary judgment on Harris' failure-to-accommodate claim for the reasons explained below, it does not address Parkland's contention that this claim is also time-barred.

A

The ADA prohibits discrimination in employment against a qualified individual on the basis of her disability. 42 U.S.C. § 12112(a). Under the ADA, to "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A). To prevail on an ADA failure-to-accommodate claim, a plaintiff must show that: "(1) the plaintiff is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered employer; and (3) the employer failed to make reasonable accommodations for such known limitations." *Feist v. La., Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (footnote and internal quotation marks omitted). A "qualified individual" is one who can perform the essential functions of the employment position, either with or without a reasonable accommodation. 42 U.S.C. § 12111(8).

B

Parkland contends that Harris' failure-to-accommodate claim fails as a matter of law because the ADA does not require an employer to accommodate an employee if she is capable of performing her essential job functions. Parkland maintains that, in this case, Harris could perform the essential functions of her job without accommodation because, *inter alia*, it is undisputed that Harris continued performing her floating and walking duties for nine months after Parkland denied her request for an accommodation (i.e., until her

-11-

termination).  Parkland next contends that Harris' request to work only in the OB/ICC was not a reasonable accommodation because floating through the hospital was an essential function of Harris' job, and the ADA did not require Parkland to eliminate essential job functions in order to reasonably accommodate Harris; allowing Harris to work only in OB/ICC would have placed a heavier burden on her coworkers; and Harris' requested accommodation could not have been offered without compromising the hospital functions, staff needs, and patient needs.

Harris responds that Parkland is not entitled to summary judgment based on evidence that Harris continued to work for nine months after her request for an accommodation was denied because, if this were the law, an employer could illegally deny a legal request for an accommodation, and, if the employee "could not afford to quit her job and therefore[] decided to endure the swelling and pain and suffering caused by continuing to work without an accommodation," the employer would be let off the hook and "[s]urely this was not the intent of the ADA."  P. Br. 15.  Harris next disputes that floating in the Main ED was an essential function of the PRS position.  In support, she cites evidence that PRSs were not required to rotate for approximately eight years; even after the job description revision, PRSs did not begin floating until August 2013; there was no set schedule under which PRSs rotated, but, instead, "it was all up [to] the discretion of Williams-Brim," *id.* at 16; in January and February 2014 Harris spent a majority of her time in OB/ICC and/or L&D Triage training a new employee, without floating to the Main ED; and the reason given for the decision to require Harris to float was merely consistency and fairness, i.e., other PRSs

-12-

thought it was unfair and preferential to permit Harris to remain in OB/ICC and not work in the Main ED.[7]  Finally, Harris argues that her requested accommodation—that she not be required to work in the Main ED—was reasonable because floating was not an essential element of Harris' job; Parkland has failed to explain why excusing Harris from working in the Main ED would have required coworkers to work longer and harder in the areas in which Harris did not work; Parkland believed that excusing Harris from floating would have been unfair and preferential, but the ADA permits preferential treatment for disabled individuals in the form of "reasonable accommodations"; and Parkland has failed to provide evidence that excusing Harris from working in the Main ED would have caused an undue burden on Parkland.

## C

The court begins by considering whether Harris has adduced sufficient evidence to demonstrate that she is a "qualified individual" with a disability for purposes of her failure-to-accommodate claim.[8]  Under the ADA, a "qualified individual" is one who can perform

---

[7]Harris also disputes that the PRS job description accurately describes the job requirements of a PRS in the Main ED.

[8]Although Parkland notes that Harris could, and did, work in the Main ED for nine months following the denial of her request for an accommodation, it does not dispute that Harris is disabled within the meaning of the ADA.  Also, Parkland does not expressly challenge Harris' ability to prove that she is a "qualified individual" under the ADA.  It does, however, clearly argue and cite cases standing for the proposition that "[i]f the disabled person must be exempted from performance of an essential function of the job, then she is not *otherwise qualified* and not protected by the ADA." D. Br. 18 (emphasis added).  Accordingly, the court will treat Parkland's argument that "Plaintiff's alleged request to work only in the OB/ICC was not a reasonable accommodation," *id.* at 16, as directed at the first

the essential functions of the employment position, either with or without a reasonable accommodation. 42 U.S.C. § 12111(8). The Fifth Circuit adheres to a two-tiered analysis for determining whether a person is "qualified" under the ADA:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

*Chandler v. City of Dallas*, 2 F.3d 1385, 1393-94 (5th Cir. 1993).

Harris' failure-to-accommodate claim turns on whether working in the Main ED is an essential function of the PRS position. "A function is 'essential' if it bears 'more than a marginal relationship' to the employee's job." *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014) (quoting *Chandler*, 2 F.3d at 1393). In determining the essential functions of a position, "[c]ourts owe deference to an employer's position description." *Id.*; *see also* 42 U.S.C. § 12111(8) ("consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."); *Dudley v. Dall. Indep. Sch. Dist.*, 2001 WL 123673, at *8 (N.D. Tex. Jan. 12, 2001) (Boyle, J.) ("To determine which functions of any particular job are 'essential,' the ADA provides that an employer's written description of

_____

element of her failure-to-accommodate claim.

-14-

those functions is entitled to substantial deference." (citing 42 U.S.C. § 12111(8); *Riel v.*

*Elec. Data Sys. Corp.*, 99 F.3d 678, 682 (5th Cir. 1996)).   "But this deference is not

absolute." *LHC Grp.*, 773 F.3d at 698.  To determine whether a function is essential

> a court may hear a variety of evidence, including "(1) the
> employer's judgment as to which functions are essential, (2)
> written job descriptions prepared before advertising or
> interviewing applicants for the job, (3) the amount of time spent
> on the job performing the function, and (4) the work experience
> of both past and current employees in the job."

*EEOC v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 730 (5th Cir. 2007) (quoting

*Kapche v. City of San Antonio*, 176 F.3d 840, 843 (5th Cir. 1999)); *see also LHC Grp.*, 773

F.3d at 698 ("The inquiry into whether a particular function is essential initially focuses on

whether the employer *actually requires* employees in the position to perform the functions

that the employer asserts are essential." (citation omitted)).

Parkland contends that the ability to float throughout the hospital is an essential

function of the PRS position.  It maintains that, although PRSs were not always required to

float throughout the hospital, when Parkland reorganized the Department in 2012 (resulting

in a RIF and the acquisition of an additional unit), it determined that, in the future, PRSs

would need to function as floaters throughout the units they supported "to ensure adequate

coverage and that registration of patients was performed in a timely and efficient manner."

D. Br. 4.  The PRS job description—revised April 11, 2013—reflects this requirement,

stating under the heading "Job Accountabilities," "Functions as a floater to ensure coverage

and registration of patients are performed in a timely and efficient manner when needed."

D. App. 39.

Harris disputes that floating was an essential requirement of the PRS position, and she cites the following evidence in support: (1) PRSs were not required to rotate for approximately eight years, and the job description was not changed to include floating until April 2013; (2) even after the job description revision, PRSs did not begin to float until August 2013; (3) after August 2013 the PRS rotation schedule was left to the discretion of Williams-Brim; (4) in January and February 2014 Harris spent a majority of her time in OB/ICC and/or L&D Triage, without floating to the Main ED; and (5) Parkland took the position that it was unfair and preferential to permit Harris to remain in the OB/ICC area and not work the Main ED.

Viewing the evidence in a light most favorable to Harris as the summary judgment nonmovant and drawing all reasonable inferences in her favor, the court concludes that a reasonable jury could not find that floating throughout the hospital was *not* an essential function of the PRS position, despite Parkland's listing floating in the job description of the PRS. Evidence that floating was not a job requirement prior to the Department's reorganization and that it took Parkland several months to implement the new floating requirement does not reasonably permit the finding that, as of the time Harris requested an accommodation (approximately July through August 2013), floating was *not* an essential function of the PRS position. And evidence that Williams-Brim had discretion in setting the schedule or that, during certain months, Harris spent a majority of her time working in units other than the Main ED, would not permit a reasonable jury to disregard that the *ability to*

-16-

*float to the Main ED* was an essential function of the job, especially given the evidence that the purpose of requiring floating was to "ensure coverage and registration of patients are performed in a timely and efficient manner *when needed*," *id.* (emphasis added), and that other PRSs floated to the Main ED and even complained about Harris' refusal to do so. Finally, evidence that Harris' coworkers thought it unfair that Harris would be permitted not to rotate to the Main ED and that Harris' superiors cited this evidence in explaining why she would be required to rotate does not undermine Parkland's determination that floating is an essential function of the PRS position.  Accordingly, because Harris has failed to raise a genuine issue of material fact regarding whether floating to the Main ED is an essential function of the PRS position, the court concludes that a reasonable jury could only find, based on the summary judgment record, that floating to the Main ED *is* an essential function of the PRS position.

Harris contends that she was unable to rotate through the Main ED without an accommodation.[9]  But the only accommodation Harris requested was not to be required to

_____

[9]Despite the undisputed fact that Harris could, and did, rotate through the Main ED for nine months following the denial of her request for an accommodation, the court will assume, for purposes of her failure-to-accommodate claim, that Harris was "unable" to perform this function.  Otherwise, Parkland would likely be entitled to summary judgment on the basis that there was no limitation for which it failed to make a reasonable accommodation. The court notes, however, that although it is assuming that Harris was unable to perform the essential function of floating to the Main ED for purposes of her failure-to-accommodate claim, it does not rely on this same assumption with respect to her disability discrimination claim.

perform the essential function of floating to the Main ED.[10]   "As a matter of law, it is an unreasonable accommodation for the employer to have to exempt the employee from performance of an essential function of the job."  *Jones v. Kerrville State Hosp.*, 142 F.3d 263, 265 (5th Cir. 1998) (citing *Barber v. Nabors*, 130 F.3d 702, 709 (5th Cir. 1997)); *see also Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999) ("Since one of the essential duties of any firefighter is to fight fires, if [plaintiff] cannot perform that duty, then he cannot be reasonably accommodated as a matter of law."); *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 808 (5th Cir. 1997) ("[W]hile the ADA focuses on eradicating barriers, the ADA does not relieve a disabled employee or applicant from the obligation to perform the essential functions of the job." (citation omitted)); *Jordan v. Crossroads Util. Serv., LLC*, 2015 WL 4724803, at *7 (W.D. Tex. Aug. 10, 2015) ("It is not a reasonable accommodation to require the Defendant to eliminate an essential function of the job[.]").  As a matter of law, it would not be reasonable to require Parkland to eliminate an essential function of the PRS position to accommodate Harris' alleged disability.  Because Harris contends that she cannot

---

[10]The court expresses no view on whether Parkland could have reasonably accommodated Harris' alleged disability in another way.  Harris asserts that there are genuine disputes as to whether Parkland reasonably could have accommodated her inability to walk more than 4 hours in an 8-hour shift, but there is no evidence in the summary judgment record that she asked to be accommodated in any way other than by not being required to rotate through the Main ED.  Because a reasonable jury could not find that Harris requested any other reasonable accommodation, and she neither alleges nor argues that Parkland failed to engage in an interactive process with her to determine what would be the most reasonable accommodation, *see Cutrera v. Board of Supervisors of Louisiana State University*, 429 F.3d 108, 112 (5th Cir. 2005), the court will not speculate about whether Parkland could reasonably have accommodated Harris' alleged disability in another way.

perform the essential function of rotating through the Main ED without an accommodation,

but the only accommodation she requested was to be exempt from rotating through the Main

ED, Harris is not a "qualified individual" under the ADA.  Accordingly, the court grants

Parkland's motion for summary judgment on Harris' failure-to-accommodate claim.[11]

IV

The court turns next to Harris' claim that she was discriminated against on the basis

of her disability, in violation of the ADA.

A

Because Harris relies on circumstantial evidence to support her ADA discrimination

claim, it is properly analyzed under the *McDonnell Douglas*[12] burden shifting framework.

---

[11]Even assuming *arguendo* that rotating through the Main ED was *not* an essential function of the PRS position, Parkland would nonetheless be entitled to summary judgment because, under the ADA, an employer has no obligation to create a new "light duty" position for a disabled employee.  *See Foreman*, 117 F.3d at 809 ("An employer is not required to create 'light duty' jobs to accommodate." (citing *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996))).  Moreover, Harris likely cannot prove that Parkland failed to make a reasonable accommodation because Harris' requested accommodation—being excused from rotating to the Main ED—would "result in other employees having to work harder or longer," which the ADA does not require.  *Hammond v. Jacobs Field Servs.*, 499 Fed. Appx. 377, 382 (5th Cir. 2012) (per curiam) (citing *Turco*, 101 F.3d at 1094 ("[A]n accommodation that would result in other employees having to work harder or longer is not required under the ADA.")).  Harris argues that Parkland has failed to provide "any explanation as to why this would be the case."  P. Br. 18.  But on this record, no further explanation is necessary.  If Harris never rotated through the Main ED, but all of the other PRSs did, the other PRSs would necessarily work more hours in the Main ED (which Harris, herself, contends is more demanding than the other units) than they would were Harris included in the rotation.

[12]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*See Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir. 1999) (holding that *McDonnell Douglas* framework, which is used in cases brought under Title VII, applies to ADA cases when only circumstantial evidence of discrimination is offered).   As modified, the *McDonnell Douglas* framework consists of three stages.  First, Harris must establish a prima facie case of discrimination, which "creates a presumption that [Parkland] unlawfully discriminated against [her]."  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).  To establish a prima facie case of discrimination based on a disability under the ADA, Harris must show that (1) she had a disability, (2) she was qualified for the job, and (3) there was a causal connection between an adverse employment action and her disability.[13] *Rodriguez v. Eli Lilly & Co.*, __ F.3d __, 2016 WL 1612760, at *4 (5th Cir. Apr. 21, 2016) (citing *LHC Grp.*, 773 F.3d at 697).

Second, if Harris establishes a prima facie case, the burden shifts to Parkland to articulate a legitimate, nondiscriminatory reason for the employment action taken against her. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993).  Parkland's burden is one

---

[13]There is "a discrepancy in the Fifth Circuit's cases evaluating the requisite nexus between an employee's disability and her termination." *LHC Grp.*, 773 F.3d at 695.  In *LHC Group* the Fifth Circuit held that, "'[t]o establish a prima facie discrimination claim under the ADA, a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; and (3) that he was subject to an adverse employment decision on account of his disability.'"  *Id*. at 697 (brackets omitted) (quoting *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999)); *but see, e.g., McCollum v. Puckett Mach. Co.*, 628 Fed. Appx. 225, 229-30 (5th Cir. 2015) (per curiam) (holding that a plaintiff must show: "(1) [h]e is disabled, (2) he is qualified for his job, (3) he was subjected to an adverse employment action on account of his disability and (4) he was replaced by or treated less favorably than non-disabled employees.").  Because the parties both articulate prima facie requirements similar to those in *LHC Group*, the court will do the same.

of production, not proof, and involves no credibility assessments.  *See, e.g., West v. Nabors Drilling USA, Inc.*, 330 F.3d 379, 385 (5th Cir. 2003).

Third, if Parkland meets its production burden, Harris must show that the legitimate, nondiscriminatory reason proffered by Parkland "[is] not its true reason[], but [was] a pretext for discrimination."[14] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253); *see also EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009).  Therefore, to survive summary judgment, Harris must "offer sufficient evidence to create a genuine issue of material fact . . . that [Parkland's] reason is not true, but is instead a pretext for discrimination."  *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (citation and internal quotation marks omitted) (describing standard in context of age discrimination case).

These three steps constitute the *McDonnell Douglas* framework.  "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Reeves*, 530 U.S. at 143 (quoting

_____

[14]As this court has previously observed, it is unclear whether the mixed-motives alternative to rebutting a defendant-employer's proffered legitimate reason is still viable in ADA discrimination cases after the Supreme Court's decision in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 175 (2009) (holding that mixed-motives theory is unavailable under the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.*).  *See Thomas v. Greystar Mgmt. Servs., L.P.*, 2014 WL 2519165, at *3 n.4 (N.D. Tex. June 4, 2014) (Fitzwater, C.J.).  The court need not decide whether the mixed-motives theory is available here, because Harris has only attempted to show that Parkland's proffered legitimate, nondiscriminatory reason is pretextual.

*Burdine*, 450 U.S. at 253).

B

Harris contends that Parkland discriminated against her, in violation of the ADA, when Williams-Brim sent her home on September 13, 2013, resulting in the loss of approximately three hours of pay, and when she was terminated.  Assuming *arguendo* that Harris has established a prima facie case of disability discrimination based on her termination,[15] Parkland has produced evidence of a legitimate, nondiscriminatory reason for discharging Harris: she had already received verbal, written, and final warnings for violating various Parkland policies in the fall of 2013, and Parkland believed Harris' conduct on May 29, 2014 in relation to Gosha constituted aggressive, unprofessional, and disruptive behavior, in violation of Parkland's Colleague Behavior Expectations Policy.  Violation of company policy is a legitimate, nondiscriminatory reason for termination.  *See, e.g., Mendez v. Dollar Tree Stores, Inc.*, 114 Fed. Appx. 149 (5th Cir. 2004) (per curiam) (holding that continuing

---

[15]Parkland argues, and the court agrees, that to the extent Harris bases her ADA discrimination claim on Williams-Brim's sending her home on September 13, 2013, this claim is time-barred.  In a deferral state such as Texas, an aggrieved party must file a charge of discrimination with the EEOC within 300 days after the alleged unlawful practice occurred.  *See* 42 U.S.C. § 2000e-5(e); *see also* 42 U.S.C. § 12117(a) (providing that the procedures set forth in 42 U.S.C. § 2000e *et seq.* apply to claims arising under the ADA); *Dao v. Auchan Hypermarket*, 96 F.3d 787, 789 (5th Cir. 1996) ("an employee must comply with the ADA's administrative prerequisites prior to commencing an action in federal court against her employer for violation of the ADA.").  The 300-day filing period is not jurisdictional, but rather is more akin to and operates as a limitations period. *E.g., Blumberg v. HCA Mgmt. Co.*, 848 F.2d 642, 644 (5th Cir. 1988); *Pruet Prod. Co. v. Ayles*, 784 F.2d 1275, 1279 (5th Cir. 1986).  Harris filed her charge of discrimination with the EEOC on July 14, 2014.  Her charge is therefore untimely as to any discriminatory conduct that occurred before September 17, 2013 (300 days before July 14, 2014).

violation of company policy was legitimate, nondiscriminatory reason for terminating employment).

C

Because Parkland has satisfied its burden of producing a legitimate, nondiscriminatory reason for discharging Harris, the burden shifts back to Harris to produce sufficient evidence for a reasonable jury to find that Parkland's articulated reason is pretextual.  Harris contends that Parkland's explanation for her termination is unworthy of belief because Cook admitted during her deposition that video footage of the incident between Harris and Gosha showed "playfulness," not aggressive and disruptive behavior; video footage of the incident does not show that any patient saw or heard any of the actions that took place; there was suspicious timing because Parkland received the investigating officer's written report on June 3, 2013 and terminated Harris by 4:00 p.m. the following day; Harris' termination resulted from discriminatory write-ups; and Harris' termination was approved by all of the individuals who denied her right to an accommodation and an individual who denied her appeal of the final warning.

The court concludes that Harris has failed to carry her burden of creating a genuine issue of material fact.  Harris disputes that her conduct on May 29, 2014 in relation to Gosha was aggressive and disruptive and contends that video footage does not show that any patient saw or heard the alleged altercation between her and Gosha.  Yet Harris adduces no evidence that would permit a reasonable jury to find that the decisionmakers at Parkland did not *actually believe* that Harris' behavior constituted "[u]nacceptable or [d]isruptive [b]ehavior,"

-23-

*as defined in Parkland's employee manual.*[16]   D. App. 49.   Moreover, even if the decisionmakers at Parkland were incorrect that Harris' conduct with respect to Gosha violated Parkland's employee behavior policy, this is an insufficient basis to enable a reasonable jury to find pretext.  *See Mesa v. Verizon Bus. Network Servs., Inc.*, 2012 WL 3452696, at *9 (N.D. Tex. Aug. 14, 2012) (Fitzwater, C.J.) (citing cases); *see also, e.g., Dickerson v. Metro. Dade Cnty.*, 659 F.2d 574, 581 (5th Cir. Unit B Oct. 1981) (observing that even if employer was wrong in its evaluation of employee's absenteeism, it did not violate Title VII if it acted on reasonable belief); *Coltin v. Corp. for Justice Mgmt., Inc.*, 542 F.Supp.2d 197, 204 (D. Conn. 2008) (holding that employee failed to show that employer's reason for terminating him, even if shown to be wrong or mistaken, was pretextual, and quoting Third Circuit holding that, "[t]o discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent." (alteration in original)

---

[16]The Human Resources Procedure Manual states, in pertinent part:

> Unacceptable or disruptive behavior is any behavior that interferes with the ability of others to effectively carry out their duties, undermines a patient's confidence in the organization or another Parkland Colleague, compromises safety and quality, has a negative impact on turnover, teamwork, or collaboration.

D. App. 49.   The Manual defines "Unacceptable or Disruptive Behavior" to include "[i]ntimidation or abusive language," "[d]isplays of anger or shouting outbursts," "[a]ggressive or assaultive behavior," and "[u]nprofessional demeanor or conduct."  *Id.* at 49-50.

(quoting *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 331 (3d Cir. 1995))).

Harris contends that her termination resulted from discriminatory write-ups, but she admitted during her deposition that she committed the infractions for which she received corrective action before she was terminated, and that such corrective action was consistent with Parkland's progressive discipline policy.

Regarding her suspicious timing argument, Harris contends that "it is more likely" that the decision to terminate her employment was made in advance of the decisionmakers' receiving the investigating officer's June 3, 2013 report and watching the video of the incident involving Gosha.  P. Br. 22.  But Harris offers no evidence in support of this assumption.  *See Islamic Ass'n of DeSoto, Tex., Inc. v. Mortg. Elec. Registration Sys., Inc.*, 2013 WL 169229, at *7 n.11 (N.D. Tex. Jan. 16, 2013) (Fitzwater, C.J.) ("Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence." (citations omitted)).  Moreover, Harris provides no reason why her superiors would be unable to review the report, watch the video, review witness statements, obtain approval from five management-level employees, and sign off on her termination by 4:00 the following day.

Finally, Harris attempts to prove pretext on the basis that her termination was approved by the same individuals who had previously denied her request for an accommodation and appeal of her final warning.  But she adduces no evidence that would enable a reasonable jury to link her June 4, 2014 termination with the request for an accommodation that she made in September 2013, or the appeal of her final warning.  The

mere fact that the same group of individuals denied her request for an accommodation and then terminated her employment nine months later is insufficient of itself to show pretext. *See Nobles v. Cardno, Inc.*, 549 Fed. Appx. 265, 267 (5th Cir. 2013) (per curiam) (holding that plaintiff "must do more than speculate; he must prove that the articulated reasons for his termination are a pretext.  Mere subjective assertions, without more, are insufficient." (citing *Waggoner v. City of Garland, Tex.*, 987 F.2d 1160, 1164 (5th Cir. 1993))).

In sum, the most Harris has done is create a weak fact issue as to whether Parkland's proffered reason for her termination—repeated policy violations—was the real reason for her termination.  As explained above, "[t]he ultimate question is whether the employer intentionally discriminated, and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is . . . correct.'" *Reeves*, 530 U.S. at 146-47 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 524).  "In other words, '[i]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.'"  *Id.* at 147 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 519).  Aside from the fact that Harris had previously had knee surgery that she alleges prevented her from walking for more than two to four hours per day, Harris presents no evidence that would enable a reasonable jury to find that this alleged disability, as opposed to some other reason, was the but-for cause of her termination. Accordingly, the court grants Parkland's motion for summary judgment on this claim.

V

Harris also brings a claim for disability harassment.  To succeed on a claim for disability-based workplace harassment under the ADA, a plaintiff must demonstrate

> (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action.

*Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235-36 (5th Cir. 2001).  The legal standard for workplace harassment is "high."  *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir. 2003).  "For workplace abuse to rise to the level of an actionable offense the 'disability-based harassment must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment.'"  *Id.* (quoting *Flowers*, 247 F.3d at 236).  In determining whether a reasonable jury could find that the environment in which Harris worked was hostile, the court considers the totality of the circumstances, including such factors as the frequency of the conduct, the severity of the conduct, the degree to which the conduct was physically threatening or humiliating, and the degree to which the conduct unreasonably interfered with the employee's work performance.  *E.g., Long v. Eastfield Coll.*, 88 F.3d 300, 309 (5th Cir. 1996).  "The environment must be deemed 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'"  *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 479 (5th Cir. 2008) (quoting *Faragher v. City of Boca Raton*,

524 U.S. 775, 786 (1998)).

Parkland argues that Harris' ADA harassment claim must fail because none of the alleged harassment was disability-based and none of the alleged harassment was so severe or pervasive that it affected a term or condition of her employment.  Harris responds by listing the following instances in which Williams-Brim allegedly harassed her: (1) making her work in the Main ED against doctor's orders; (2) rescheduling and/or maintaining Harris scheduled in the Main ED after she returned from FMLA leave; (3) issuing Harris three unwarranted write-ups and ultimately terminating her employment; (4) yelling and being verbally disrespectful and belittling toward Harris in front of other managers and coworkers; (5) "sending Harris home against her will causing her to lose eight hours of pay because Harris informed Williams-Brim that because of her knee disability she was in too much pain to work the east side of the Main ED (Williams-Brim responded that Harris was evidently paralyzed and couldn't do the job so she needed to get off her clock)," P. Br. 23; (6) denying Harris vacation time when requested; and (7) accusing Harris of a crime she did not commit. She then argues that "the above-detailed conduct is enough to establish harassment that permeated the workplace," *id.* at 24, and that she has accordingly met her burden of establishing harassing conduct sufficiently pervasive or severe to alter the conditions of her employment and create an abusive working environment.

The court concludes that Harris has failed to introduce sufficient evidence for a reasonable jury to find that she was subjected to disability-based harassment that was so severe that it affected a term, condition, or privilege of employment.  First, Harris has failed

to argue or adduce *any* evidence that the following conduct by Williams-Brim was based on Harris' disability: making Harris work in the Main ED, including when she returned from FMLA leave; issuing three write-ups and terminating her employment, *see supra* § IV; yelling and being verbally disrespectful and belittling toward Harris; denying her vacation time; and falsely accusing her of committing a crime. Harris alleges that when she informed Williams-Brim that she was in too much pain to work the east side of the Main ED, Williams-Brim responded that Harris "must be paralyzed and to get off her clock,"[17] P. App. 9, and sent Harris home against her will causing her to lose eight hours of pay. Even assuming this harassment was based on Harris' alleged disability, a reasonable jury could only find that this single incident was isolated and was neither sufficiently severe nor pervasive to alter the terms or conditions of Harris' employment. *See, e.g., Faragher*, 524 U.S. at 788 ("isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment" (citation and internal quotation marks omitted)).

Accordingly, the court grants Parkland's motion for summary judgment on Harris' claim for disability-based workplace harassment under the ADA.

---

[17]Parkland objects to this statement as wholly unsupported by the evidence in the record. Because the court is granting Parkland's motion for summary judgment, it overrules the objection as moot.

VI

Finally, the court addresses Harris' ADA retaliation claim.

A

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  Because Harris relies on circumstantial evidence in support of her ADA retaliation claim, the court proceeds under the *McDonnell Douglas* burden-shifting analysis set out above.  *See Miller v. Metrocare Servs.*, 2015 WL 477233, at *15 (N.D. Tex. Feb. 5, 2015) (Fitzwater, J.), *aff'd*, 809 F.3d 827 (5th Cir. 2016).  "To establish a prima facie case of retaliation under the ADA . . . a plaintiff must show that (1) she participated in an activity protected under the statute; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse action."  *Feist*, 730 F.3d at 454 (citing *Seaman*, 179 F.3d at 301).  "If the employee establishes a prima facie case, the burden shifts to the employer to state a legitimate, non-retaliatory reason for its decision.  After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually a pretext for retaliation," *LeMaire v. Louisiana*, 480 F.3d 383, 388-89 (5th Cir. 2007) (internal citation omitted), which the employee accomplishes by showing that the adverse action would not have occurred "but for" the employer's retaliatory motive, *Seaman*, 179 F.3d at 301.  To avoid summary judgment, the plaintiff must show "a

-30-

conflict in substantial evidence" on the question of whether the employer would not have taken the action "but for" the protected activity.  *Long*, 88 F.3d at 308 (5th Cir. 1996) (citation and internal quotation marks omitted).

B

The court concludes that Harris participated in a protected activity when she requested that she be accommodated by being permitted not to rotate to the Main ED.  The court also holds that Harris was subjected to an adverse employment action when she was terminated.[18] Parkland argues that Harris cannot establish a prima facie case of retaliation because there is no evidence of a causal link between any protected activity and an adverse employment action.  Harris responds that the temporal proximity between her first complaint of discrimination on July 30, 2013 and her termination on June 4, 2014 supports a causal link; that but for the discriminatory write-ups, her employment record would not support her dismissal since she worked at Parkland for 13 years with a relatively discipline-free record before requesting an accommodation; that Parkland's actions constituted a departure from typical policies and procedures; that even though Parkland acknowledged an exception to the rotation for medical necessity, it refused to accommodate Harris despite her "clear medical necessity," P. Br. 27; that Williams-Brim had discretion in how to designate Harris' incidents

--------

[18]Harris contends that she was also subjected to the following adverse employment actions: being forced to work in the Main ED against doctor's orders, and rescheduling and/or maintaining Harris scheduled in the Main ED after she returned from FMLA leave. It is undisputed that all PRSs were required to rotate through the Main ED as part of their job.  Forcing Harris to perform the required duties of her job cannot constitute an adverse employment action as a matter of law.

and could have provided counseling sessions or more than one verbal warning rather than issuing a verbal, written, and final warning within a three-month period; and "the fact that Harris was terminated for attempting to resolve an issue with a friend, who happened to be a co-worker, at the request of Williams-Brim in a manner that attempted to lighten [the] mood of the situation seems nonsensical," *id.*

Because the causal link requirement of a prima facie case is minimal, the court will assume *arguendo* that Harris has satisfied it.  Even so, she has not met her burden of introducing evidence that would enable a reasonable trier of fact to find "but for" causation at the third step of the *McDonnell Douglas* paradigm.  A reasonable trier of fact could not find that the decision to terminate Harris' employment in June 2014 was motivated by her request for an accommodation months earlier in 2013. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" (citation omitted)).  Moreover, Harris has not adduced evidence that creates a genuine issue of material fact regarding whether Parkland's stated reasons for her termination—multiple violations of Parkland policy—were pretextual. As explained above, although Harris argues that Williams-Brim could have opted to issue a less severe form of disciplinary action, she does not dispute that she *did*, in fact, violate various Parkland policies on three occasions (resulting in a verbal, written, and final warning).  And although she characterizes her conduct with respect to Gosha as "playful"

and "not aggressive, disruptive or unprofessional," P. Br. 27, she does not dispute that decisionmakers at Parkland reviewed all of the evidence relating to the incident and determined that her conduct violated Parkland's "Employee Standards/Expectations" policy.

In sum, Harris has failed to create a genuine fact issue on the ultimate question of "but-for" causation. She has failed to introduce evidence that would enable a reasonable jury to find that the proffered reason for her termination—her multiple violations of Parkland policy—was not the real reason Parkland terminated her. And Harris neither contends nor has introduced evidence that she would not have been terminated "but for" her request for an accommodation months earlier. In other words, based on the evidence in the summary judgment record, no reasonable jury could find that Harris' request for an accommodation was the but-for cause of her termination. *See Seaman*, 179 F.3d at 301.

Accordingly, the court concludes that Parkland is entitled to summary judgment dismissing Harris' retaliation claim.[19]

---

[19]Harris initially brought claims under the TCHRA, which prohibits an employer from discriminating against or discharging an employee because of the employee's disability. *See* Tex. Lab. Code Ann. § 21.051. It is unclear whether the parties intended to dismiss Harris' TCHRA claim in their October 12, 2015 stipulation. Regardless, assuming Harris' TCHRA claim survived the stipulation, the law governing claims under the ADA and the TCHRA is identical. *See, e.g., Cortez v. Raytheon Co.*, 663 F.Supp.2d 514, 520-21 (N.D. Tex. 2009) (Kinkeade, J.) (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 n.2 (5th Cir. 1999)). Harris' failure to raise a genuine issue of material fact on her ADA claims dictates that her TCHRA claim be dismissed as well. Accordingly, to the extent Harris still intends to pursue her TCHRA claim, the court grants Parkland's motion for summary judgment "on each of Plaintiff's claims," D. Br. 1, and dismisses Harris' TCHRA claim.

*   *   *

For the foregoing reasons, the court grants Harris' motion for leave to file supplement to plaintiff's summary judgment evidence, denies Parkland's motion to strike plaintiff's summary judgment, grants Parkland's motion for summary judgment, and dismisses this action with prejudice by judgment filed today.

**SO ORDERED**.

May 19, 2016.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE